No. 23-13642-F

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**UNITED STATES OF AMERICA**,
Appellee,

v.

**ANTHONY BLAIR**,
Appellant.

On appeal from the United States District Court
for the Northern District of Georgia

**BRIEF OF APPELLANT**
ANTHONY BLAIR

CAITLYN WADE
Federal Defender Program, Inc.
101 Marietta Street, NW, Suite 1500
Atlanta, GA  30303
(404) 688-7530
Caitlyn_Wade@FD.org

Counsel for Anthony Blair

No. 23-13642-F
United States v. Anthony Blair

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-2(a), counsel certifies that the following have an interest in the outcome of this appeal:

Anand, Hon. Justin S., United States Magistrate Judge

Arias, Jason, Co-Defendant

Barros, David Lomba, Co-Defendant

Blair, Anthony, Appellant

Brickman, Jeffrey H., Attorney for Co-Defendant Newton

Buchanan, Ryan K., United States Attorney

Campbell, Mark A., Attorney for Co-Defendant Barros

Christian, Ryan M., Former Assistant United States Attorney

Church, Thomas Daniel, Former Attorney for Appellant

Dodge, W. Matthew, Attorney for Appellant

Dunn, Mildred Geckler, Former Attorney for Appellant

Erskine, Kurt R., Former Acting United States Attorney

Hartigan, Nicholas, Former Assistant United States Attorney

Hollingsworth, William Boyd, Attorney for Co-Defendant Vernon

Johnson, Jess Brandel, Former Attorney for Appellant

Joshi, Vidhi S., Former Attorney for Appellant

Kaplan, Nicole M., Attorney for Appellant

No. 23-13642-F
United States v. Anthony Blair

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Kearns, Stephanie A., Executive Director, Federal Defender Program

Kelleher, Madison Renee, Co-Defendant

Leipold, Calvin Artie, Assistant United States Attorney

Mann, Tyler A., Assistant United States Attorney

May, Hon. Leigh Martin, United States District Judge

McAfee, Scott Franklin, Former Assistant United States Attorney

Mendelsohn, Brian, Former Attorney for Appellant

Newton, Daniel, Co-Defendant

Pak, Byung J., Former United States Attorney

Pate, Page Anthony, Former Attorney for Appellant

Richardson, Jr., Max Charles, Former Attorney for Appellant

Rosa, Michelle, Co-Defendant

Salinas, Hon. Catherine M., United States Magistrate Judge

Samuel, Donald Franklin, Attorney for Co-Defendant Tuzon

Strongwater, Jay Lester, Attorney for Co-Defendant Kelleher

Terry, Katherine Irene, Assistant United States Attorney

Tuzon, Angelica Dominique Cuyugan, Co-Defendant

United States of America, Appellee

Vernon, Shondra, Co-Defendant

C-2 of 3

No. 23-13642-F
United States v. Anthony Blair

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT**

Wade, Caitlyn, Attorney for Appellant

Walker, Hon. Linda T., United States Magistrate Judge

Webster, Leigh Ann, Attorney for Co-Defendant Arias

Whitfield, Jennifer, Former Assistant United States Attorney

Williams, Bret R., Attorney for Co-Defendant Rosa

No publicly traded company or corporation has an interest in the outcome

of this case or of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Blair requests oral argument. This appeal raises several issues of first impression in the Eleventh Circuit. Additionally, the record in this case spans five years including three indictments, five hundred docket entries, and a six-day trial. Oral argument will allow the parties to assist the panel in analyzing the novel issues raised and streamlining the voluminous record.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement..... C-1

Statement Regarding Oral Argument.................................................. i

Table Of Citations ......................................................................... v

Statement of Jurisdiction................................................................1

Statement of the Case ...................................................................3

    A.    Course of Proceedings and Disposition Below.............................3

    B.    Statement of Facts.................................................................6

        1.    Blair's February 5, 2018, arrest ...............................9

        2.    Seizure and Search of Blair's cellphone from February 5, 2018 .......................................................9

        3.    Blair's June 10, 2018, arrest ...................................12

        4.    Daniel Newton and Jason Arias Cooperation ..................13

        5.    Trial .......................................................................17

        6.    Jury Instructions....................................................20

        7.    Rule 29 Motion and Verdict...................................20

        8.    Sentencing ...........................................................21

    C.    Standard of Review .............................................................22

Summary of the Argument...........................................................24

Argument and Citation of Authority..............................................26

I.    Mr. Blair's due process rights were violated resulting in the
      denial of a fair trial and sentencing hearing. ..........................................26

      A.    The government's contrary positions—between the plea
            agreement with Arias and Arias' trial testimony against
            Blair at trial—violated Blair's due process rights. .......................27

      B.    Blair's due process rights were further violated when the
            district court considered Arias's tainted trial testimony to
            support a substantively and procedurally unreasonable
            sentence. ............................................................................................29

II.   The district court violated Blair's Sixth Amendment right to
      counsel by allowing the government to present evidence at trial
      that was obtained as a result of an intrusion into Blair's
      attorney-client relationship. .......................................................................32

III.  The district court erred in admitting demonstrably flawed
      cellular extraction evidence through a non-expert witness. ...............36

      A.    The district court erred in admitting cellular extraction
            evidence that was not properly authenticated. ...........................36

      B.    The district court failed to ensure the reliability of the
            cellular extraction evidence when it was admitted
            through a non-expert witness. .........................................................39

IV.   The district court erred in quashing Blair's subpoenas for
      former AUSA Ryan Christian. ....................................................................44

      A.    The district court's decision is reviewable. ...................................45

      B.    The plain language of the authorizing statute applies only
            to current government employees. ..................................................47

      C.    The evidence was admissible under FRE Rule 608(a) ...............48

V.    The district court erred by instructing the jury on deliberate
      ignorance. .......................................................................................................49

VI.   The evidence was insufficient to show that Blair had to
      requisite knowledge to be found guilty. .................................................52

Conclusion.........................................................................................................54

Certificate of Compliance and Service.............................................................55

iv

# TABLE OF CITATIONS

**Federal Cases**

*Brady v. Maryland*,
   373 U.S. 83 (1963) ......................................................... 30

*Bruno v. Rushen*,
   721 F.2d 1193 (9th Cir. 1983) ........................................ 30

*Commonwealth of Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) ............................................ 48

*Crawford v. Washington*,
   541 U.S. 36 (2004) ........................................................ 36

*Drake v. Kemp*,
   762 F.2d 1449 (11th Cir. 1985) .................................. 26, 27

*Edwards v. U.S. Att'y Gen.*,
   97 F.4th 725 (11th Cir. 2024) ........................................48

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ...................................................... 52

*Koopmann v. United States Dep't of Transportation*,
   335 F. Supp. 3d 556–61 (S.D.N.Y. 2018) ...................... 47

*Le v. United States*,
   204 F.App'x 812 (11th Cir. 2006) .............................. 33, 34

*Lightbourne v. Duggar*,
   829 F.2d 1012 (11th Cir. 1987) ...................................... 35

*Louisiana Dep't of Transportation & Dev. v. United States Dep't of
Transportation, No. CV*
   15-2638, 2015 WL 7313876 (W.D. La. Nov. 20, 2015) ................................. 45

*Massiah v. United States,*
    377 U.S. 201 (1964) ........................................................... 34

*Rita v. United States,*
    551 U.S. 338 (2007) ........................................................... 31

*Smith v. Groose,*
    205 F.3d 1045 (8th Cir. 2000) .......................................... 28

*Thomas v. Calderon,*
    120 F.3d 1045 (9th Cir. 1997) ..................................... 28, 30

*United States ex rel Touhy v. Ragen,*
    340 U.S. 462 (1951) ..................................................... 18, 45

*United States v. Beckles,*
    565 F.3d 832 (11th Cir. 2009) .......................................... 53

*United States v. Brown,*
    415 F.3d 1257 (11th Cir. 2005) ........................................ 22

*United States v. Brown,*
    587 F.3d 1082 (11th Cir. 2009) ........................................ 38

*United States v. Capers,*
    708 F.3d 1286–1308 (11th Cir. 2013) .............................. 38

*United States v. Doherty,*
    233 F.3d 1275 (11th Cir. 2000) ........................................ 22

*United States v. Dotson,*
    799 F.2d 189 (5th Cir. 1986) ............................................ 48

*United States v. Ganier,*
    468 F.3d 920 (6th Cir. 2006) ...................................... 41, 42

*United States v. Garcia*,
 405 F.3d 1260 (11th Cir. 2005) ........................................................ 23

*United States v. Gibson*,
 708 F.3d 1256 (11th Cir. 2013) ........................................................ 23

*United States v. Hawkins*,
 905 F.2d 1489 (11th Cir. 1990) .................................................. 37, 38

*United States v. Hunt*,
 526 F.3d 739 (11th Cir. 2008) ......................................................... 22

*United States v. Irey*,
 612 F.3d 1160 (11th Cir. 2010) (en banc) ................................. 22, 31

*United States v. Jimenez*,
 705 F.3d 1305 (11th Cir. 2013) ........................................................ 23

*United States v. Kattar*,
 840 F.2d 118 (1st Cir. 1988) ........................................................... 30

*United States v. Kennard*,
 472 F.3d 851 (11th Cir. 2206) ........................................................ 50

*United States v. King, No. CV 4:19-CR-77*,
 2020 WL 5803528 at *7 (E.D. Va. Sept. 25, 2020) ................... 32, 33

*United States v. Kojayan*,
 8 F.3d 1315 (9th Cir. 1993) ............................................................ 30

*United States v. Louis*,
 861 F.3d 1330 (11th Cir. 2017) ....................................................... 52

*United States v. Maitre*,
 898 F.3d 1151 (11th Cir. 2018) ....................................................... 52

*United States v. Martin*,
455 F.3d 1227 (11th Cir. 2006) ........................................................ 31

*United States v. Ojebode*,
957 F.2d 1218 (5th Cir. 1992) ..........................................................50

*United States v. Reynolds*,
345 U.S. 1–10 (1953) ........................................................................ 46

*United States v. Rivera*,
944 F.2d 1563 (11th Cir. 1992) ................................................. 20, 50

*United States v. Robinson*,
505 F.3d 1208 (11th Cir. 2007) ....................................................... 23

*United States v. Rodgers, No. 4:20-CR-00358*,
2022 WL 1074013 (E.D. Tex. Apr. 8, 2022) ................................... 46

*United States v. Roper*,
874 F.2d 782 (11th Cir. 1989) ......................................................... 33

*United States v. Stanley*,
533 F. App'x 325 (4th Cir. 2013) .................................................... 42

*United States v. Steed*,
548 F.3d 961 (11th Cir. 2008) ......................................................... 50

*United States v. Steele*,
733 fed. Appx. 472 (11th Cir. 2018) ............................................... 22

*United States v. Stone*,
9 F.3d 934 (11th Cir. 1993) ................................................. 49, 50, 51

*United States v. Thomas*,
916 F.2d 647 (11th Cir. 1990) ................................................... 52, 53

*United States v. Turner,*
474 F.3d 1265 (11th Cir. 2007) ....................................................... 22

*United States v. Vergara,*
884 F.3d 1309 (11th Cir. 2018) ....................................................... 43

*United States v. Yu,*
411 F. App'x. 559 (4th Cir. 2010) ................................................... 42

*Vines v. United States,*
28 F.3d 1123 (11th Cir. 1994) ......................................................... 22

*Weatherford v. Bursey,*
429 U.S. 545 (1977) .......................................................................... 33

*Wood v. Georgia,*
450 U.S. 261–70 (1981) ................................................................... 32

**Federal Statutes & Rules**

5 U.S.C. § 301 ................................................................................... 45

18 U.S.C. § 3231 ................................................................................. 1

18 U.S.C. § 3553 ......................................................................... 21, 31

18 U.S.C. § 3742 ................................................................................. 1

28 U.S.C. § 1291 ................................................................................. 1

U.S.S.G. § 2D1.1 ..................................................................... 16, 17, 18

U.S.S.G. § 3B1.1 ............................................................................... 21

Fed. R. App. P. 4 ................................................................................. 1

Fed. R. Crim. P. 29. Evidence ......................................................... 52

Fed. R. Evid. 702 ........................................................................... 40, 41

Federal Rule of Criminal Procedure 29 ................................................. *passim*

Federal Rule of Evidence 901 ................................................................ *passim*

Federal Rule of Evidence Rule 901. Rule 901 ...................................... 36, 37

FRE 701 ........................................................................................ 48

FRE Rule 608 ................................................................................ 48

Rule 29 ......................................................................................... 20

Rule 608 ................................................................................... 19, 20

Rule 702 ............................................................................. 39, 41, 42

**Other**

28 CFR §§ 16.21 ........................................................................ 18, 19

*Orin S. Kerr, Searches and Seizures in a Digital World*,
   119 Harv. L. Rev. 531 (2005) ....................................................... 43

No. 23-13642-F

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

───────────────

**UNITED STATES OF AMERICA**,
Appellee,

v.

**ANTHONY BLAIR**,
Appellant.

───────────────

**STATEMENT OF JURISDICTION**

The district court had jurisdiction over this case under 18 U.S.C. §
3231 because an indictment was filed charging Blair with federal crimes.
This is a direct appeal from an order and judgment of the district court; the
Court of Appeals has jurisdiction over this appeal under 18 U.S.C. § 3742
and 28 U.S.C. § 1291. Blair filed the notice of appeal on November 1, 2023,
within 14 days of the entry of the district court's judgment and
commitment order. Fed. R. App. P. 4(b)(1)(A). This appeal is from a final
order of the district court that disposes of all the parties' claims in this case.

1

## STATEMENT OF THE ISSUE(S)

Did the government's contrary prosecutorial positions—between the plea agreement with co-defendant Jason Arias and Arias' trial testimony against Blair at trial—violate Blair's due process rights? Further, did the district court err by relying on Arias' tainted testimony to enhance Blair's sentencing guideline range and to impose a sentence five times longer than that of Arias?

Did the government violate Blair's Sixth Amendment right to counsel when it engaged Arias as a cooperating witness despite knowing that Arias paid for Blair's counsel and was continuing to communicate with Blair on an ongoing basis? Further, did the district court err by allowing Arias to introduce incriminating evidence he obtained by communicating with Blair during the time period that Arias was cooperating with the government and Blair was represented by counsel?

Did the district court err by admitting cellular extraction evidence through a non-expert witness when there were demonstrable flaws in the extraction process?

Did the district court err in quashing Blair's subpoenas based on a finding that the *Touhy* regulations applied to former Department of Justice employees and that the regulations were not satisfactorily met?

Did the district court err in instructing the jury on deliberate ignorance when the government argued that Blair had actual knowledge of the criminal activity?

Was the evidence of Blair's knowledge insufficient to sustain his convictions?

## STATEMENT OF THE CASE

### A.     Course of Proceedings and Disposition Below

On February 5, 2018, Anthony Blair was arrested for conspiring to import at least five hundred grams of a mixture and substance containing a detectible amount of cocaine ("cocaine") and conspiring to possess with intent to distribute said substance. (Doc. 1) (1:18-mj-00115-JKL). A criminal complaint was filed the next day formally charging Blair with these offenses. (*Id.).* On February 8, 2018, Blair was released on a $50,000 unsecured bond. (Doc. 8) (1:18-mj-00115-JKL). On March 1, 2018, the government's motion to dismiss the charges without prejudice was granted. (Doc. 15) (1:18-mj-00115-JKL).

On June 10, 2018, Blair was arrested for conspiring to possess with intent to distribute cocaine. (Doc. 1) (1:18-mj-00550-LTW). A criminal complaint was filed the next day formally charging Blair with the offense. *(Id.).* Once again, Blair was released on a $50,000 unsecured bond. (Doc. 8) (1:18-mj-00550-LTW).

On July 2, 2018, an indictment was filed charging Blair with 1) conspiring to import five or more kilograms of cocaine into the United States between March 2017 and February 5, 2018, 2) conspiring to possess with intent to distribute five or more kilograms of cocaine between March 2017 and February 5, 2018, and 3) possessing with intent to distribute

3

cocaine on February 5, 2018. (Doc. 10).[1]  The initial indictment did not reflect any charges related to Mr. Blair's June 2018 arrest.

On December 4, 2018, a superseding indictment was filed charging Blair with 1) conspiring to import cocaine into the United States between February 2017 and December 4, 2018, 2) conspiring to possess with intent to distribute five or more kilograms of cocaine between March 2017 and December 4, 2018, 3) possessing with intent to distribute cocaine on February 5, 2018, 4) importing cocaine into the United States on February 5, 2018, 5) importing cocaine into the United States on June 10, 2018, 6) possessing with intent to distribute cocaine on June 10, 2018, and 7) conspiring to launder money between November 2017 and December 4, 2018. (Doc. 36). On March 27, 2019, a second superseding indictment was filed.  Various charges were brought against Jason Arias, Daniel Newton, David Barros, Angelica Tuzon, Michelle Rosa, and Madison Kelleher; however, the charges against Blair were unchanged. (Doc. 53).

Trial was initially scheduled to begin on November 29, 2021, but was later continued to April 11, 2022. (Docs. 314, 335). On March 25, 2022, the government filed a motion to admit evidence and to inquire into potential conflicts of interest. (Doc. 354). The motion alleged that co-defendant Arias had paid $50,000 to the law firm Pate, Johnson, and Church in order to secure legal representation for Blair. (*Id.* at 2-3). The motion further alleged

---

[1] All docket citations without further notation will reference the primary docket in this case—1:18-cr-00260-LMM-CMS.

that evidence of such payment was admissible at trial and probative of the drug conspiracy alleged in the indictment. (*Id.* at 3-5). Lastly, the motion requested that the district court inquire as to whether the alleged payment presented a conflict of interest that would prevent Blair's counsel from continuing to represent him. (*Id.* at 5-8). Following the government's motion, Blair's counsel at Pate, Johnson, and Church voluntarily withdrew from representing him and requested that the trial be continued. (Doc. 358). On May 4, 2022, the Federal Defender Program, Inc., was appointed to represent Blair. (Doc. 364).

Blair's trial began on May 16, 2023, with a full day of jury selection. (Doc. 460). The government presented its case-in-chief on May 17, 18, 19, and 22. (Docs. 475, 476, 477, and 478). After the government rested its case, Blair made an oral motion for a judgement of acquittal pursuant to Federal Rule of Criminal Procedure 29. (Doc. 478). Blair did not present a case-in-chief. (*Id.*). On May 23, 2023, the parties made closing arguments, the jury was instructed, and the jury engaged in deliberations. (Doc. 480). The jury returned a verdict of guilty on counts one through four and six through seven. (Doc. 483). Mr. Blair was found not guilty as to count five. (*Id.*). Blair was taken into custody following the verdict. (Doc. 480).

On October 20, 2023, Blair was sentenced to a period of 240 months of incarceration to be followed by five years of supervised release. (Doc. 527). The district court ordered Blair to pay $600 in special assessments and that

5

he forfeit $434,195.00 to the United States. (*Id.*). Blair currently remains in custody.

**B.    Statement of Facts**

Jason Arias became involved in a conspiracy to import cocaine from Costa Rica into the United States and to launder the proceeds of such illegal activity beginning in October of 2015. (Doc. 536 at 507). Arias was initially approached by his uncle, Jose Bartolo Arias Blass, and his cousin, Jonathan Polanco, with a business proposal of sorts.[2] (*Id.* at 514-515). The proposal involved Arias finding people who were willing to travel to Costa Rica and to allow "souvenirs" to be packed in their luggage on their return trip to the United States. (*Id.* at 515). The pitch to the travelers was simple; they would receive an all-expenses paid vacation to Costa Rica. (*Id.* at 525). The only requirement was that they would need to transport "souvenirs" in their luggage on the return trip to determine whether airport officials had tampered with the items. (*Id.*; Doc. 535 at 139). These "souvenirs" included items like cups, trinkets, t-shirts, and cans of fruit and vegetables. (Doc. 536. at 516).

Arias initially transported "souvenirs" from Costa Rica and the Dominican Republic himself. (*Id.* at 528). In 2015, he was arrested at Boston's Logan airport upon his return from the Dominican Republic for having four cans in his luggage that contained cocaine. (*Id.*). When Arias

---

[2] Throughout this brief, Jason Arias will be referred to as Arias while Jose Bartolo Arias Blass will be referred to as Arias Blass.

questioned his uncle about the contents of the cans, he was told that the substance could not be "traced" for cocaine. (*Id.*). When Arias later met with federal agents, he clarified that his uncle told him that the chemical composition of the substance in the cans was not illegal so he could not be prosecuted. (Doc. 538 at ₱57). Arias believed his uncle--particularly after the criminal case from Boston was never prosecuted. (*Id.* at ₱56-57; Doc. 536. at 529). Arias later learned that the substance was in fact cocaine. (*Id*).

After the airport incident in 2015, Arias stopped taking trips for his uncle for about a year. (Doc. 536 at 528). His uncle then approached him once again in order to encourage him to get back into the conspiracy. (*Id.*). Once Arias renewed his participation in the conspiracy, he recruited several others. Arias recruited and paid his cousin David Barros to travel to Costa Rica and to bring cans of cocaine back into the United States. (Doc. 538 at ₱57). Arias also instructed Barros to bring empty cans and large sums of cash to Costa Rica. (Doc. 536 at 531).

Arias also recruited Daniel Newton. Arias and Newton initially met and became friends unrelated to the conspiracy. (Doc. 539 at 940). Newton confided in his friend that it was his goal to own a Jimmy Johns restaurant. (*Id.* at 990). Arias then offered to help Newton obtain the $80,000 that was needed to purchase the business. (*Id.* at 991). Arias claimed that he could triple Newton's initial $45,000 investment in three to four months by investing it. (*Id.*). It was only after Newton's investment that Arias confronted him about participating in the cocaine conspiracy. (*Id.* at 996).

7

Once Newton had become concerned about Arias' lack of payment on the investment, Arias showed him the cocaine and told him that he would need to help process and transport it if he wanted to get his money back. (*Id.*). From that point, Newton became involved in the conspiracy. (*Id.*).

Arias also recruited Blair to join his "business venture." They first met when Arias worked as a concierge and Blair worked for his own credit repair business. (Doc. 536 at 523-524). They formed a business relationship when Blair provided Arias with credit repair services. (*Id.*). Arias introduced Blair to his family members—Arias Blass and Polanco—so that they could also get their credit repaired. (*Id.* at 525). Arias told Blair that he had been getting free trips to Costa Rica and the Dominican Republic through his uncle and all he had to do was bring back souvenirs. (*Id.* at 525-526). Blair agreed to take similar trips for Arias and Arias Blass. (*Id.*).

Later, Blair agreed to find other people who would be interested in taking trips. (*Id.* at 530). Blair was told to find pairs of people who would be willing to travel on an all-expenses paid trip to Costa Rica. (*Id.* at 530-531). Blair would also be responsible for making travel arrangements for each group of travelers. (*Id.* at 531). Arias would then place souvenirs in the luggage that they would bring back to the United States for Arias Blass. (*Id.*). Blair agreed to be a part of the business and was paid $2,500 per pair of travelers that he booked for trips. (*Id.*). Arias did not tell Blair that the cans included in the "souvenirs" contained cocaine. (Doc. 539 at 845).

8

### 1. Blair's February 5, 2018, arrest

On February 5, 2018, Department of Homeland Security ("HSI") and Customs and Border Patrol ("CBP") agents intercepted three passengers—Summer Swartz, Sequoya Quixote, and Shedarian Pearson—at the Miami airport. (Doc. 536 at 35-36). Two of the three passengers—Swartz and Quixote—had cocaine in their luggage. (*Id.* at 36). Agents interviewed all three passengers.

Swartz and Quixote told agents that they were travelling back to Atlanta from Costa Rica. (*Id.* 42-45). They had planned to contact Blair upon arrival in Atlanta. (*Id.*). They provided agents with a phone number that they had been using to communicate with Blair. (*Id.*).

Swartz agreed to cooperate with agents. (Doc. 535 at 202). She made several monitored phone communications with Blair and acted as if she had just landed at the Atlanta airport. (*Id.*). Swartz provided Blair with a location that she would be exiting baggage claim and Blair responded that he would be in a Black Tahoe. (*Id.*). Agents instructed Swartz to have Blair put his "flashers" on. (*Id.*). Using this description, agents located Blair and took him into custody. (*Id.*).

### 2. Seizure and Search of Blair's cellphone from February 5, 2018

After taking Blair into custody, agents seized a cellular phone from the area surrounding the center console in his vehicle. (Doc. 535 at 208). Agent Roy Rutherford instructed agents in Miami to send a text message to the phone number that Swartz and Quixote had given for Blair. (Doc. 536 at

9

321). Agents then used Blair's birthdate to attempt to access the phone. (*Id.*). Agents were then able to access the settings of the phone to access its identifying information. (*Id.*). Only after these manipulations, did agents place the phone in a Faraday bag.[3] (*Id.*).

On February 6, 2018, agents obtained a federal search warrant authorizing the search of this phone.  That same day, agents performed a forensic extraction of the phone using Cellebrite.  In an application for a subsequent search warrant, Agent Rutherford acknowledged that this initial extraction contained technical errors because it was performed using outdated software. (1:18-MC-313; Application and Affidavit for Search Warrant). At trial, Agent Rutherford explained that the initial extraction contained a "major flaw" and that the data contained date stamps that were fifty years in the future. (Doc. 535 at 215).

An additional search warrant was signed, and Agent Rutherford performed a second extraction of Mr. Blair's phone on March 5, 2018. (*Id.* at 217). In a pretrial motion in limine, Blair raised concerns about the accuracy of this extraction. (Doc. 405). This motion included several facts and circumstances that called into question the reliability of the forensic data extraction of Blair's cell phone seized on February 5, 2018.  First, the extraction data provided in discovery indicated that the phone contained

---

[3] A Faraday bag is a protective tool that is used to prevent electronic evidence from sending or receiving signals that could alter the evidence. (Doc. 535 at 213).

the encrypted messaging application, Signal. (Doc. 405 at 3). In April of 2021, Moxie Marlinspike, the security researcher who founded Signal in 2013, reported that Signal had hacked Cellebrite's phone cracking devices and detailed a series of vulnerabilities in the products.[4]  Signal reported that there were more than one hundred security vulnerabilities, just one of which could modify "not just the Cellebrite report being created in that scan, but also all previous and future generated Cellebrite reports from all previously scanned devices and all future scanned devices." (*Id*.). (quoting Marlinspike).

Blair argued that his concerns regarding the Signal application were corroborated by the fact that there were various data points found within the extraction that could not possibly have existed on his phone at the time of the extraction in 2018. (Doc. 405 at 3). For example, there were a number of GPS data points from a Runmeter application with date stamps from July 22, 2022, to August 9, 2022—data from four years after the phone was extracted. (Doc. 405-1).

Blair also argued that Agent Rutherford's interactions with the phone prior to placing it in the Faraday bag raised concerns about the extraction's reliability. (Doc. 405 at 4).

---

[4]  The Guardian, *Signal founder: I hacked police phone-cracking tool Cellebrite*, available at https://www.theguardian.com/technology/2021/apr/22/signal-founder-i-hacked-police-phone-cracking-tool-cellebrite (last accessed April 19, 2023).

11

Blair argued that these concerns collectively showed that the government could not meet the authentication standard of Federal Rule of Evidence 901 and that the evidence should be excluded. (*Id*.). Blair also argued that the admission of forensic extraction testimony of this sort required the use of an expert witness to ensure its reliability. (*Id*.). The district court denied Blair's motion before trial. (Doc. 426). Blair renewed his objection when the government moved to admit the evidence at trial. (Doc. 535 at 218).

### 3. Blair's June 10, 2018, arrest

On June 10, 2018, Arias' cousin Michelle Rosa was stopped and arrested at the Atlanta airport with five cans of cocaine in her checked luggage. (Doc. 535 at 221). Rosa agreed to cooperate with the officers. (*Id.* at 223). She explained that she had been contacted by her cousin, Arias, about taking a trip to Costa Rica. (*Id.* at 229). Arias paid for her trip and asked her to return with "souvenirs" including the cans that were later determined to contain cocaine. (*Id*). She was told the purpose of the trip was to ensure that no one tampered with the items in her luggage when she returned to the United States. (*Id.* at 224).

Rosa agreed to make several recorded calls in order to assist law enforcement. (*Id.* at 230). She contacted Arias to ask who would be picking her up at the airport and what she was supposed to do with the "souvenirs." (*Id*). Arias told her to contact Barros. (*Id.* at 234). Barros refused to pick Rosa up from the airport, so agents ultimately took her to

12

her apartment. (Doc. 536 at 293). Rosa contacted Arias after arriving at her apartment to let him know that the souvenirs could be picked up. (*Id.*).

One agent was positioned in Rosa's apartment while several others waited in the parking lot area. (*Id.*). Once the agent heard knocking at Rosa's door, other agents moved in and saw Blair—who they took into custody. (*Id.* at 295). Rutherford testified that they had anticipated Barros would be the one to arrive and that he was surprised to see Blair. (*Id.*).

A Federal Bureau of Investigations expert in cellular records analysis testified that a cell phone utilized by Barros travelled from Boston, Massachusetts on June 9, 2018, to Atlanta on June 10, 2018, and back to Boston on June 11, 2018. (*Id.* at 498-500). Barros' cellular records show that he was in the Atlanta area for two to three hours on June 10, 2018, while he was in continuous communication with Arias. (*Id.* at 502-503).

Newton testified that Arias was also in contact with him on the night of June 10, 2019, and that Arias tried to get him to go "check on" his cousin (Rosa). (Doc. 539 at 1000-1001). Newton refused to go because he believed it was a "set up." (*Id.* at 1001). Arias then sent Blair to Rosa's apartment and told Newton, "What are they going to do? He's just going over there to see what's going on." (*Id.* at 1002).

### 4.    Daniel Newton and Jason Arias Cooperation

On May 10, 2019, approximately a month after his arrest, Newton sat down for a proffer session with AUSA Ryan Christian, Agent Rutherford, and CBP Officer Gavin Jenkins. (Doc. 408 at 2-3). During this interview,

13

Newton told the government that Arias was paying for Blair's attorneys. (*Id.*). Specifically, he stated that he knew Arias was paying for both of Blair's attorneys after his two arrests—in February and June of 2018. (*Id.*). He also explained that Arias had been in "constant contact" with Blair by contacting him on one of his many phones. (*Id.*).

A few weeks later, on May 30, 2019, Newton sat down for a second proffer session with the government. AUSA Christian, Agent Rutherford, and Officer Jenkins were all present again. (*Id.* at 3). During this proffer session, Newton revealed after Arias found out about Blair's arrest in February 2018, Arias returned from Costa Rica so he could pay for Blair's lawyer. (*Id.*). During this time, Arias asked Newton to borrow money for Blair's lawyers twice. (*Id.*). Newton also told the government that Arias "became broke" after Blair was arrested the second time in part because of the money he had paid to retain Blair's attorney. (*Id.*).

On September 16, 2019, Special Agent Jose Romero wrote out an application and affidavit for a search warrant to search Arias's phone. In that affidavit, Agent Romero explained that Arias had asked Newton for money to pay for Blair's attorneys prior to Newton and Arias's arrest in the case. (Doc. 408-1). Agent Romero wrote, "In or about October 2018, Arias asked Newton for money so that Arias could continue paying for Blair's attorney to ensure that Blair did not cooperate against Arias. Newton informed law enforcement of this conversation after he and Arias were arrested on April 2, 2019." (Doc. 408-1 at 11).

14

About a week later, Arias decided he wanted to cooperate with the government and on September 25, 2019, Arias sat down for a proffer session with AUSA Christian, Agent Rutherford, and Officer Jenkins. (Doc. 408 at 4). During this interview, Arias explained that he was borrowing money to pay off prior debts and to specifically pay for Blair's attorney— corroborating the information provided to the government by Newton. (*Id.*).

Despite being told on three separate occasions that Arias was paying for or had paid for Mr. Blair's attorneys, the government took no action. Instead, it chose to engage Arias as a cooperating witness. In a telephonic proffer session on November 26, 2019, Agent Rutherford—with the knowledge that Arias had paid for Blair's lawyer—asked Arias about his conversations with individuals he was cooperating against. (*Id.*). He also specifically asked if Arias had continued to record his conversations with any other individuals including Blair. (*Id.*).

Just before Arias sat down for his first proffer session with the government in September, Arias obtained a cellular phone which he exclusively used to communicate with Blair. (*Id.* at 4-5). Arias used this cell phone to communicate with Blair from September 2019 through December 2019—essentially the entire time he was cooperating. (*Id.*). This phone contained thousands of text messages between Arias and Blair discussing the case, cooperating, money Arias owed Blair, and various other topics.

15

(*Id*.). At some point, Arias turned this phone over to the government as evidence against Blair. (*Id*.).

On August 10, 2020, the government entered a plea agreement with Arias that contained several benefits. (Doc. 244-1). Upon Arias' plea to counts one and seven, the remaining counts would be dismissed by the government. (*Id*. at 5). The government and Arias agreed that the applicable offense guideline was U.S.S.G. § 2D1.1(a)(5) and (c)(5). (*Id*.). This indicated that the government agreed that Arias was only responsible for between five and fifteen kilograms of cocaine. U.S.S.G. § 2D1.1(a)(5) and (c)(5). Lastly, the government agreed to recommend a two-level downward variance from the adjusted guideline range and that Arias should be sentenced at the low end of the range. (Doc. 244-1 at 8). All of these benefits were contingent upon Arias' agreement to cooperate with the government in whatever way the government requested. (Doc. 247).

Two and a half years later, in March of 2022, Arias sat down for another proffer session with the AUSA Cal Leipold, AUSA Tyler Mann, and Agent Rutherford to prepare for his testimony at trial. (Doc. 408 at 5). During this proffer session, Arias again told the government that he had paid for both of Blair's attorneys. (*Id*). Specifically, he stated that he had paid $10,000 to Max Richardson, Blair's first retained attorney, and $50,000 to Page, Johnson, and Church—the law firm of Blair's second retained attorneys. (*Id*.).

16

On March 25, 2022, the government raised to the district court, for the first time, the conflict of interest issue that Arias's payments to Blair's attorney created. (Doc. 354 at 5-8). Citing, in part, to the text messages on Arias's phone described above, it also requested a ruling that it be permitted to introduce testimony and documentary evidence regarding Arias's payments to Blair's attorneys. (*Id.* at 3-5). On March 29, 2022, Page, Johnson, and Church filed a motion to withdraw as Blair's attorneys, (Doc. 358), and the Court granted that request. (Doc. 360). The Federal Defender Program was subsequently appointed to represent Blair. (Doc. 364).

In a pretrial motion in limine, Blair argued that Arias should not be permitted to testify against him at trial or to introduce the communications between him and Blair during the time that Blair was represented and Arias was cooperating with the government. (Doc. 408). The district court denied Blair's motion. (Doc. 429).

### 5.    Trial

At trial, the government called sixteen witnesses—several investigating officers and agents, Swartz, Quixote, two forensic chemists, an FBI expert in cellular records analysis (pertaining to Barros' cellular records), Arias, Rosa, Newton, and a corporate fraud auditor. Blair did not contest much of the government's evidence. He agreed that he made travel arrangements for individuals that traveled to Costa Rica and returned with "souvenirs." (Doc. 540 at 1128-1129). He also agreed that he was paid for his work and that cash was deposited into various accounts that he

17

controlled. (*Id.*). His sole contention at trial was that he was unaware that his actions contributed to a scheme involving a controlled substance.

On cross-examination, Arias admitted that he told Blair that the substance was "untraceable cocaine" or a substance that was not chemically cocaine. (Doc. 539 at 839, 845-846). Arias' own recorded communications with Blair showed that Arias told Blair that he was not aware of what was in the cans. (*Id.*). Arias went so far as to suggest to Blair that the DEA lab reports (finding that the substance was cocaine) could be wrong. (*Id.* at 846).

Blair attempted to call former AUSA Christian to impeach Arias—the government's key witness. On April 19, 2023, counsel for Blair served a letter on the Department of Justice (DOJ) that complied with *United States ex rel Touhy v. Ragen*, 340 U.S. 462 (1951) and 28 CFR §§ 16.21 – 16.26. (Doc. 422, Ex. A). The letter indicated that counsel intended to subpoena former AUSA Christian, that it was Blair's contention that the regulations did not apply to former employees, and that the Sixth Amendment and due process trump *Touhy* and related regulations. (*Id.*). Counsel for Blair indicted that Christian was being subpoenaed to testify regarding his opinion of the character for truthfulness of Jason Arias, a cooperating co-defendant. (*Id.*).

Christian had previously made public statements about Arias's character for truthfulness at Arias's bond revocation hearing. (Doc. 255, at 6, 37). ("[A]ll of this fits within essentially the government's understanding

18

of who Mr. Arias is, which is, a liar and a conman."; "All he does is lie and fake things and create fake documents . . ."). On May 4, 2023, the government responded and denied the request. (Doc. 422, Ex. C). Notably, the government did not rely on any assertion of privilege. Instead, the government relied on the Federal Rules of Evidence to argue admission of the testimony would be improper. (*Id.*).

The government filed a motion to quash the subpoena the next day. (Doc. 422). That motion also made no claim of privilege and reasserted the government's evidentiary objections. (*Id.* at 6-10). The district court quashed the subpoena. (Doc. 450). The court found that *Touhy* applies to former employees. (*Id.* at 3). The court also concluded that it could only overrule the DOJ's decision if it was arbitrary and capricious, citing a civil appeal from this Court. (*Id.* at 4). As relevant here, the district court also concluded that the evidence would not be admissible under Rule 608(a) because it believed Christian did not have personal knowledge of Arias's character for truthfulness. "There is no suggestion that Mr. Christian had interviewed Mr. Arias at any time or that he otherwise had primary knowledge upon which he could base a rational opinion of Mr. Arias's truthfulness." (*Id.* at 7).

On May 15th, 2023, Blair renewed his *Touhy* request, clarifying that the request for testimony about Christian's opinion regarding Arias' character for truthfulness. Counsel for Blair then argued to the court that

19

Christian did have personal knowledge of Arias's character for truthfulness because, in addition to reviewing all of the evidence in the case,

> then he acquired personal knowledge because he did interview Mr. Arias in a lengthy proffer where Mr. Arias makes numerous inconsistent statements, a number of lies . . .

(Doc. 536 at 273-74). The court again denied the motion to quash. (*Id*. at 275).

### 6.    Jury Instructions

Blair objected to the court giving an instruction on deliberate ignorance. (Doc. 537 at 676). Blair argued that the government's theory was that he had actual knowledge of the drug importation. (*Id*.). Blair cited *United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1992) for the holding that a deliberate ignorance instruction should rarely be given. (*Id*.). Blair argued the instruction should only be given when there is evidence of conscious avoidance, rather than just a dispute about whether the government proved knowledge. (*Id*. at 676-678). The government pointed to no such evidence. (*Id*.). The court overruled the objection. (*Id*. at 679). After the jury was instructed, Blair renewed his objection to the deliberate ignorance instruction. (Doc. 540 at 1158).

### 7.    Rule 29 Motion and Verdict

After the government rested its case, Blair made a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (Doc. 539 at 1051). Specifically, Blair argued that the government's evidence was insufficient as to the knowledge element on all counts. (*Id*. at

1056). The district court denied the motion. (*Id.* at 1064-1065). The jury returned a verdict of guilty on counts one through four and six though seven. The jury found Blair not guilty as to Count Five. (Doc. 483).

### 8.    Sentencing

Blair was sentenced on October 17, 2023. (Doc. 527). The government argued that Blair should be held accountable for 150 to 450 kilograms of cocaine. (Doc. 517). The government also argued that Blair's involvement in the conspiracy warranted a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a). (*Id.*). The government recommended that Blair be sentenced to a period of 300 months or twenty-five years of incarceration. (*Id.*).

Blair argued that he should only be held responsible for between five and fifteen kilograms of cocaine—the same amount as that the government agreed Arias was responsible. (Doc. 518). Blair also argued that his role did not warrant an enhancement pursuant to U.S.S.G. § 3B1.1. (*Id.*). Blair argued that a sentence of ten years was sufficient but not greater than necessary to accomplish the commands of 18 U.S.C. § 3553(a). (*Id.*).

The district court overruled Blair's objection to the drug quantity. (Doc. 526). The court also overruled Blair's objection regarding his role in the offense but only assessed him a three-level increase for his role rather than the four levels requested by the government. (*Id.*). This resulted in a custody guideline range of 324 to 405 months. (Doc. 538 at 36). The district court ultimately sentenced Blair to 240 months or twenty years of

incarceration. Blair maintained his procedural guidelines objections and objected to the substantive reasonableness of the sentence. (Doc. 526).

## C.    Standard of Review

A due process claim is reviewed *de novo. United States v. Steele*, 733 fed. Appx. 472, 477 n. 5 (11th Cir. 2018) (citing *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008)).

This Court reviews the substantive reasonableness of a sentence under a deferential abuse of discretion standard considering the totality of the circumstances. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).

Claims that a defendant's was denied his or her Sixth Amendment right to counsel are subject to plenary review. *Vines v. United States*, 28 F.3d 1123 (11th Cir. 1994).

Evidentiary rulings are reviewed for abuse of discretion. *United States v. Brown*, 415 F.3d 1257, 1265 (11th Cir. 2005). However, when evidence that was erroneously admitted amounts to a constitutional violation, the standard of review is whether the admission of the evidence was harmless beyond a reasonable doubt. *United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007). The appellate court must ask whether "the properly admitted evidence of guilt was so overwhelming, and the prejudicial effect of the evidence so insignificant, that beyond any reasonable doubt the improper use of the statement was harmless." *Id.* quoting *United States v. Doherty*, 233 F.3d 1275, 1282 (11th Cir. 2000).

A challenge to a jury instruction presents a question of law subject to *de novo* review. *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013). The government bears the burden of establishing that the jury charge error was harmless. *United States v. Robinson*, 505 F.3d 1208, 1222 (11th Cir. 2007).

This Court exercises *de novo* review of the sufficiency of the evidence to sustain a conviction and will reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt. *United States v. Jimenez*, 705 F.3d 1305, 1308 (11th Cir. 2013) *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

The government's contrary prosecutorial positions—between the plea agreement with Arias and the testimony they elicited from Arias at trial to secure Blair's conviction—violated Blair's fundamental due process right to a fair trial. Further, the district court's reliance on Arias' tainted testimony to enhance Blair's sentencing guideline range and to impose a sentence five times longer than that of Arias violated Blair's due process right to a fair sentencing hearing.

The government interfered with Blair's Sixth Amendment right to counsel by interfering with his attorney-client relationship. The government engaged Arias as a cooperator despite knowledge that he had paid for Blair's attorney. The government further invaded Blair's attorney client relationship by continuing to engage Arias as a cooperator despite knowledge that Arias was communicating with Blair while he was represented by counsel. The district court then erred by allowing Arias to testify at trial regarding his payment for Blair's attorneys as a result of a supposed drug debt.

The district court erred by admitting cellular extraction evidence through a non-expert witness despite Blair's showing to the court that there were data points in the extraction that could not possibly have existed at the time the extraction was conducted.

The district court's erred in quashing Blair's subpoenas for former AUSA Christian. First, the district court applied an arbitrary and capricious

24

standard in deciding the motion. Second, the court erred in finding that the statute authorizes application of *Touhy* regulations to both current and *former* government employees. Third, the court erred when it concluded that the testimony would not be admissible under the Federal Rules of Evidence. This error prevented Blair from introducing key impeachment testimony of the government's star witness.

The court erred in instructing the jury on deliberate ignorance when the government's theory of prosecution focused solely on Blair's actual knowledge of the criminal activity.

The evidence as to the essential element of Blair's knowledge that his conduct was assisting in the possession or importation of a controlled substance was insufficient.

## ARGUMENT AND CITATION OF AUTHORITY

**I.    Mr. Blair's due process rights were violated resulting in the denial of a fair trial and sentencing hearing.**

A prosecutor's duty is to seek justice—not merely a conviction. When prosecutors take contradictory positions in an effort to secure convictions against co-defendants a fundamentally unfair proceeding results. *See Drake v. Kemp,* 762 F.2d 1449, 1478 (11th Cir. 1985)(Clark, J. concurring). "The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth." (*Id.*). The government employed this prohibited strategy against Blair. They induced Arias to plead guilty and to testify against Blair by agreeing to argue that Arias was responsible for only five to fifteen kilograms of cocaine.  The government then called Arias as their star witness against Blair at trial. Arias testified that he sourced all of the cocaine involved in the conspiracy—at least ten times more than the government claimed in his plea agreement.  The government not only relied on Arias' testimony to secure a conviction against Blair but also to argue for an enhanced sentencing guideline range and to advocate that he receive a sentence more than five times longer than that of Arias. Arias' testimony at trial and the district court's further reliance on it at Blair's sentencing deprived him of his due process rights.  The government's contrary positions—between Arias' plea agreement and Arias' trial testimony against Blair—violated Blair's due process rights.

26

A. **The government's contrary positions—between the plea agreement with Arias and Arias' trial testimony against Blair at trial—violated Blair's due process rights.**

On August 10, 2020, the government entered a plea agreement with Arias that contained several benefits. (Doc. 244-1). Namely, the agreement stated that the government agreed that Arias was only responsible for between five and fifteen kilograms of cocaine throughout the conspiracy. (*Id.* at 5). The agreement also included the government's recommendation that Arias receive a two-level downward variance. (*Id.* at 8). Finally, Arias's plea agreement required that he cooperate with the government including that he testify against Blair at trial. (Doc. 246-247). At the time the government entered this agreement with Arias, the government was aware that Arias had sourced between 150 and 450 kilograms of cocaine throughout the conspiracy—an amount that would have subjected Arias to a guideline range six levels higher than what the government agreed to advocate for at his sentencing.

Per the United States Attorney's Manual, plea agreements should "honestly reflect the totality and seriousness of the defendant's conduct." USAM 9-16.300. Further, it is the Justice Department's policy to stipulate "only to facts that accurately represent the defendant's conduct." (*Id.*). However, at the time the government entered the plea agreement with Arias, they were aware that Arias was actually responsible for sourcing all of the cocaine in the conspiracy—an amount they argued at Blair's sentencing was 150 to 450 kilograms of cocaine.

The Eighth and Ninth Circuits have held that the prosecutorial use of inherently contradictory theories violates the principles of due process. *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000); *Thomas v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997)(overruled on other grounds). In *Smith*, prosecutors argued that a witness's statement was truthful in their prosecution against one defendant. (*Id.* at 1051). Prosecutors then argued that the very same witness' statement was false in their prosecution of a second defendant. (*Id.*). The Eight Circuit decried the prosecutors' actions.

> Even if our adversary system is "in many ways, a gamble," *Payne v. United States*, 78 F.3d 343, 345 (8th Cir. 1996), that system is poorly served when a prosecutor, the state's own instrument of justice, stacks the deck in his favor. The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth.

(*Id.*). In *Thomas*, the Ninth Circuit agreed and stated, "It is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." 120 F.3d at 1058.

The government took a similarly contradictory position here. The government agreed that Arias sourced all of the cocaine involved in the conspiracy. In Arias' prosecution, the government took the position that he was only responsible for five to fifteen kilograms of cocaine. However, in the prosecution against Blair, the government argued that Blair was responsible for 150 to 450 kilograms of cocaine—all of which must have been sourced by Arias. Both of these positions cannot be simultaneously

true; yet, the government induced Arias into cooperating by taking a position that they then contradicted in their prosecution of Blair. This is the exact "divide and conquer" strategy that this Court has warned against.

Arias served as the government's key witness against Blair at trial. Arias testified regarding the entire criminal conspiracy and Blair's involvement in it. Most importantly, Arias was the only witness that claimed to have direct knowledge of Blair's awareness that the cans that were imported from Costa Rica contained cocaine. The government's deceptive actions rendered the trial proceedings against Blair patently unfair. This Court should therefore vacate Blair's conviction on all counts.

**B.**   **Blair's due process rights were further violated when the district court considered Arias's tainted trial testimony to support a substantively and procedurally unreasonable sentence.**

The government used Arias' testimony not only to convict Blair at trial but to argue for a sentence more than five times longer than that received by Arias. First, the government advocated that Blair should be held accountable for 150 to 450 kilograms of cocaine despite their agreement that Arias—the source of all the cocaine involved in the conspiracy—was only responsible for five to fifteen kilograms of cocaine. This resulted in a six-level increase in Blair's guideline range. Blair objected to this enhanced guideline range and argued that the district court should have precluded the government from taking such a contradictory position on an important sentencing matter. The court overruled Blair's objection

29

and relied on Arias' trial testimony to support the higher guideline range. This resulted in a procedurally unreasonable sentence and the denial of Blair's right to a fundamentally fair sentencing hearing.

As discussed above, the government's endorsement of contradictory factual scenarios in a single prosecution is a matter of fundamental fairness.

> While lawyers representing private parties may - indeed, must - do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules.

*Thomas* 120 F.3d at 1058 *quoting United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993); *See also United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) (stating that the function of the prosecutor "is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible"); *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983). This is so because "society wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Here the government simultaneously endorsed two factual scenarios that could not both be truthful. In doing so they asked the district court—who agreed—to hold Blair accountable for a drug quantity between ten and thirty times higher than the amount for which the source of the drugs was held accountable. This resulted in a procedurally unreasonable sentence that should be vacated.

30

The government's contradictory position also contributed to the district court's imposition of a substantively unreasonable sentence. A sentence which is greater than necessary to accomplish the sentencing goals of 18 U.S.C. 3553(a) is substantively unreasonable. "There will . . . be sentences outside the range of reasonableness that do not achieve the purposes of sentencing stated in § 3553(a) and that thus the district court may not impose." *United States v. Martin*, 455 F.3d 1227, 1237 (11th Cir. 2006) (citations omitted). At times, district judges "make mistakes that are substantive" and "circuit courts exist to correct such mistakes when they occur." *Rita v. United States*, 551 U.S. 338, 354 (2007).

A district court abuses its discretion and imposes a substantively unreasonable sentence when it "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189. As to the third way that discretion can be abused, "a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably." (*Id.*).

Here, the district court failed to reasonably balance the factors outlined in § 3553(a)—particularly the need to avoid unwarranted sentencing disparity and the need to reflect the seriousness of the offense. At sentencing, the government focused heavily on the seriousness of the offense —including the amount of cocaine and money involved in the

31

conspiracy and the fact that so many unknowing people were involved—in support of its sentencing request. The district court followed suit and explained that the seriousness of the offense was key to the sentence. (Doc. 573 at 62-63). However, this factor would have been equal or greater in Arias' sentencing given that he recruited Blair and sourced all of the drugs in the entire conspiracy. The district court then seemed to ignore the need to avoid unwarranted sentencing disparity by sentencing Blair to twenty years and Arias to only four years. Even accounting for Arias' cooperation and guilty plea, this disparity is extreme. Blair argues that the district court failed to properly balance the necessary sentencing factors resulting in an unreasonable sentence. As such, this court should vacate Blair sentence and remand for a new sentencing hearing.

## II. The district court violated Blair's Sixth Amendment right to counsel by allowing the government to present evidence at trial that was obtained as a result of an intrusion into Blair's attorney-client relationship.

Arias' payment for Blair's first two attorneys resulted in Blair being represented by conflicted counsel. *See Wood v. Georgia*, 450 U.S. 261, 268–70 (1981); *United States v. King*, No. CV 4:19-CR-77, 2020 WL 5803528 at *7 (E.D. Va. Sept. 25, 2020) (finding that defendant's attorney's receipt of legal fees from an alleged co-conspirator "raises an actual present conflict and the serious risk of more conflicts during trial as more evidence comes to light because it is possible that defense counsel has been paid by a third party who has interests which are potentially in conflict with those of his

client."). Nonetheless, the government endorsed Arias's behavior and decided to engage him as a cooperating witness against Blair. Through that process, Arias created additional evidence against Blair that was captured on his cell phone through phone calls, text messages, and recordings, which Arias then turned over to the government to use in preparation for trial.

The government's actions violated Blair's Sixth Amendment right to counsel in two ways. The first is a direct intrusion into the attorney-client privilege. The Supreme Court has explained in *Weatherford v. Bursey*, 429 U.S. 545 (1977), that the Sixth Amendment right to counsel can be violated when a cooperating co-defendant interferes with a defendant's relationship with his counsel and there is a purposeful intrusion into the attorney-client relationship, communication of defense strategy to the prosecution, or tainted evidence. *Id.* at 547, 558; *see also United States v. Roper*, 874 F.2d 782 (11th Cir. 1989) (citing *Bursey*).

For example, in *Le v. United States*, 204 F.App'x 812, 814 (11th Cir. 2006), a jailhouse informant elicited incriminating information from a represented co-defendant and conveyed this information to FBI agents, including defense strategy. The agents did not stop the informant when he conveyed this information to them. (*Id*. at 815). The district court ultimately found that the informant's interference with the defendant's trial strategy and the FBI agents' "failure to prevent [this] interference" represented a "rather clear violation of [the defendant's] sixth amendment rights," and

33

the Eleventh Circuit affirmed. (*Id*. at 816). The *Le* Court also affirmed the district court's denial of a motion to dismiss the indictment based on the interference claim because none of the government's evidence at trial was derived from the improper intrusions—i.e., the informant did not testify at trial and none of the information he provided to the FBI was used either. (*Id*. at 817).

Here, the government—through Agent Rutherford—knew beginning May 10, 2019, that Arias had interfered with Blair's attorney-client relationship by paying for his attorney. Rather than raise this issue with the Court as it acknowledged it has a duty to do in its own filings in district court (Doc. 354 at 6), the government failed to prevent the interference just like the FBI agents in *Le*. And unlike in *Le*, the government then presented evidence at trial that directly related to the interference—Arias' testimony that he paid for Blair's attorneys as repayment for a supposed drug debt. This evidence was the direct result of the government's violation of Blair's right to counsel and its admission necessitates that Blair's conviction be vacated.

The government also violated Blair's Sixth Amendment right to counsel by using Arias as a government agent to communicate with Blair and elicit incriminating information from him. As the Supreme Court explained in *Massiah v. United States*, 377 U.S. 201 (1964), the Sixth Amendment prohibits law enforcement officers from deliberately eliciting incriminating information from a defendant in the absence of counsel after

34

the defendant has been formally charged in a criminal case. To show that the government violated Blair's right to counsel under the *Massiah* line of cases, Blair must show that Arias was a government agent, and he deliberately elicited incriminating statements from Blair. *See Lightbourne v. Duggar*, 829 F.2d 1012, 1020 (11th Cir. 1987). To determine whether an individual is a government agent for this inquiry, the answer depends on the "facts and circumstances" of each case. (*Id.*). At a minimum, there must be some evidence of an agreement between the individual and the government at the time the elicitation takes place. (*Id.*).

Here, Arias was acting as a government agent. In May of 2019, Newton told Agent Rutherford that Arias and Blair had been in constant communication since Arias's arrest. Arias then began to cooperate with the government in September 2019. In a proffer session in November 2019, Agent Rutherford asked Arias about his conversations with other alleged co-conspirators including Blair, and if he had continued recording his conversations with them. This question makes clear that not only was Agent Rutherford aware of Arias's conversations with these individuals — he  was encouraging them.

Through this encouragement, Arias continued to speak with Blair and gathered additional incriminating information against him on the cell phone referenced above, which he then turned over to the government. The text messages contained incriminating information on topics such as: Blair requesting Arias send him money; Arias and Blair discussing the

amount he has paid Mr. Blair thus far, including the $50,000 to Page Pate; Arias telling Blair why he should have known better than to show up at a co-defendant's home after being arrested in June; Arias urging Blair to admit which members of the conspiracy he knew, when he spoke with them, why he knew the substance in the cans was cocaine, and calling Blair a liar. The government gained access to this information that it otherwise would not have been able to access because it was gained at a time when Blair was represented. The government then elicited testimony from Arias at trial regarding Arias' payment for Blair's attorneys as a result of the supposed drug debt. Therefore, its erroneous admission necessitates the reversal of Blair's convictions.

## III.    The district court erred in admitting demonstrably flawed cellular extraction evidence through a non-expert witness.

The ability of a criminal defendant to ensure the reliability of evidence at trial is paramount to due process and underlies such important rights as that to confront witnesses. *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004). Here the district court allowed demonstrably flawed cellular extraction evidence to be admitted through a non-expert witness and did not allow Blair sufficient cross examination to ensure the reliability of the evidence.

### A.    The district court erred in admitting cellular extraction evidence that was not properly authenticated.

The district court first erred in finding that the government had met the authentication standard of Federal Rule of Evidence Rule 901. Rule 901

requires the proponent of evidence to produce "evidence sufficient to support a finding that the item is what the proponent claims it is." At trial, the government introduced a forensic data extraction that was purported to be contents of Blair's cellular phone from February 5, 2018. (Doc. 535 at 217-218). Blair objected to its admission and raised two concerns regarding the authenticity of the extraction. (*Id.* at 218, Doc. 405-406). First, the extraction included global positioning system ("GPS") data points with dates as recent as August 9, 2022—despite the government's claims that the extraction was an accurate representation the contents of Blair's phone following his arrest on February 6, 2018. (Doc. 405-1). Second, the extraction indicated that Mr. Blair's phone contained the encrypted messaging application, Signal.

The concerns raised by the Signal hacking incident—although hypothetical when considered in the abstract—appear to be corroborated by concerning data points found in the extraction of Blair's phone. It appears that there were various data points found within the extraction that could not possibly have existed on Blair's phone at the time of the extraction in 2018. For example, there are a number of data points which show GPS data from a Runmeter application from July 22, 2022, to August 9, 2022—data from three years after the phone was extracted. (Doc. 405-1).

Under Fed. R. Evid. 901(a) the authentication requirement is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. *United States v. Hawkins*, 905 F.2d 1489, 1493

37

(11th Cir. 1990). Although the Eleventh Circuit has not addressed the authentication requirement in the context of cellular phone data extractions, it has addressed the requirement in analogous situations. Generally, in order to introduce a tape recording of a conversation, the proponent should show the competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions, or alterations in the relevant part of the tape, and the identification of the relevant speakers. *United States v. Brown*, 587 F.3d 1082, 1092 (11th Cir. 2009); *United States v. Capers*, 708 F.3d 1286, 1305, 1307–1308 (11th Cir. 2013).

Here, the government admitted the cellular evidence through Agent Rutherford who testified that he did not interact with the extraction process beyond pressing the button to activate the Cellebrite software. (Doc. 535 at 217). Agent Rutherford further testified that he was not aware of the inner workings of the Cellebrite program and how it performed the extraction from Blair's phone. (Doc. 536 at 322-323). Most importantly, Agent Rutherford testified that despite his "exhausting" review of the data extraction, he was not familiar with the data entries from 2022. (*Id.* at 326, 329). He also provided no explanation as to how data points from the year 2022 could appear in a forensic extraction that he purported to contain only the data that was on Blair's phone in February of 2018. (*Id.*). The government failed to meet the standard of Fed. R. Evid. 901(a) that the forensic extraction was what the witness purported it to be—the contents

38

of Blair's cellular phone in February of 2018.  Therefore, the district court's admission of this evidence was erroneous and warrants reversal of his conviction.

This error was particularly prejudicial because the government relied heavily on the contents of Blair's cell phone to show what was alleged to be extensive involvement in the conspiracy. The government highlighted hundreds of text message exchanges between Blair and various travelers as well as Arias.  The government argued that these messages showed Blair's knowledge of the scope and purpose of the scheme.  Because the contents of the phone were vital to the government's case, their erroneous admission necessitates that Blair's conviction be vacated.

**B.    The district court failed to ensure the reliability of the cellular extraction evidence when it was admitted through a non-expert witness.**

Cellebrite is a company that creates hardware and software products that allow users to extract and interpret data from various digital devices. Federal agents utilized Cellebrite to conduct forensic data extractions of several cellular phones seized in connection with this case.  The government admitted forensic data extractions from the cell phones of Summer Swartz, Sequoia Quixote, and Anthony Blair through federal agents who were not qualified as experts in Cellebrite technology.

Evidence of forensic data extraction—utilizing Cellebrite and comparable technology not accessible to the general public—requires specialized, technical knowledge and must be presented by an expert to

ensure evidentiary reliability. Rule 702 governs the admission of testimony that requires "technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue," and requires a witness to testify based upon his or her "knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702.

Cellebrite's products are designed to perform three basic types of extractions on various digital devices. (Doc. 406-1 at 4). Of particular note, extractions require a decoding process in order to translate the raw data into a recognizable format. (*Id.* at 7). This decoding process involves a reliance on programming that tells the software "to look for and interpret data in certain places on the device based on patterns from previous make, model, and operating system versions." (*Id.* at 8). Cellebrite acknowledges that automatic decoding may miss some items and that decoding may be impossible for certain types of data. (*Id.*). When problems with decoding are encountered, Cellebrite explains that "forensic examiners should be prepared to use the hexadecimal viewer within UFED [Universal Forensic Extraction Device] Physical Analyzer to carve for additional data if needed." (*Id.* at 9). Cellebrite further asserts, "Forensic examiners should be prepared to explain why the tool extracted but did not decode the data, and if possible, how they validated that the carved data was stored on the device."

Cellebrite acknowledges that its extraction procedures are "complex." (*Id.* at 13). As a result, the company "strongly encourages all

40

users to attend certification training in order to best understand—and explain—how to extract, decode, analyze, and document mobile device evidence using these advanced technologies." (*Id.*).

The Fourth and Sixth Circuits have held that testimony regarding digital forensic examinations, and specifically those using Cellebrite, implicate Rule 702 and must satisfy its strict evidentiary standards. These circuits reason that using and testifying about Cellebrite requires specialized and technical knowledge about computers and forensic software that the average layperson does not possess.

Specifically, the Sixth Circuit has recognized that interpreting a Cellebrite report for the jury requires the witness "to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson." *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006). It held that the testimony fell under Rule 702 because it required "scientific, technical, or other specialized knowledge." (*Id.*). The court compared Cellebrite to specialized medical tests run by doctors, like paternity blood tests, and noted that the doctors testifying about the results would be subject to Rule 702's requirements for expert testimony. (*Id.*).

While courts on occasion allow witnesses to apply specialized knowledge while giving law testimony, the court in *Ganier* looked to the 2000 amendment that clarified that lay opinions or inferences cannot be based on "scientific, technical, or other specialized knowledge within the

scope of Rule 702" to support its finding that testimony regarding forensic data extractions fell within the purview of Rule 702. (*Id.*).

Similarly, the Fourth Circuit found that Rule 702 governed the admission of a forensic data examiner's testimony about her extraction and translation of the data at issue, using software similar to Cellebrite. *United States v. Yu*, 411 F. App'x. 559, 566-67 (4th Cir. 2010) (unpublished). It noted that the examiner explained "the technique forensic examiners typically use to extract data," that they use forensic software to remove data, and that examiners "translate the raw information into a viewable format." (*Id*. at 566). After reviewing this testimony, the Fourth Circuit concluded that "the process of forensic data extraction requires 'some specialized knowledge or skill or education that is not in possession of the jurors.'" (*Id*. at 566-67) (quoting *Ganier*, 468 F.3d at 926).

It reached the same conclusion in a later case, where a computer forensic examiner from the police department used computer software to "make a 'mirror' image of [the defendant's] computer in order to examine its contents." *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (unpublished). The examination revealed that the defendant had installed a file-sharing program to download and share child pornography, and the examiner's testimony about this was held to constitute expert testimony under Rule 702. (*Id.*). In reaching this conclusion, the Fourth Circuit noted that "many courts have noted that the process of forensic data extraction

42

requires specialized knowledge or skill conducive to expert testimony." (*Id.*).

Although the Eleventh Circuit has not addressed this issue explicitly, it touched on the matter while analyzing the search of a cellular phone in the context of a potential Fourth Amendment violation. "Generally, forensic searches are 'experts' work,' performed 'by a trained analyst at a government forensics laboratory.' *United States v. Vergara*, 884 F.3d 1309, 1316 (11th Cir. 2018) (Pryor, J., dissenting) (*citing Orin S. Kerr, Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 537 (2005). This acknowledgement is in line with at least one district judge's finding in the Northern District of Georgia. In *McSweeney v. Kahn*, the district court found that testimony from a witness regarding the authenticity of a disputed email was expert testimony that was subject to notice and disclosure requirements. 2008 U.S. Dist. LEXIS 111678* 9-17 (N.D. Ga. August 6, 2008). Although the witness simply "reviewed the computer" and "verified the internet headers associated with the email" using Microsoft Outlook, a common computer program, the court found that such testimony did require the witness to rely on expertise above and beyond that of the common computer or Outlook user. (*Id*). As such the court found that the testimony in question was expert testimony and excluded it based on failure to comply with notice and discovery requirements. (*Id.* at 17).

The need for an expert witness was particularly important here because there was evidence that the Cellebrite extraction contained errors. As detailed above, there were data points in the extraction from 2022 despite the extraction being performed in 2018. When Blair attempted to cross-examine Agent Rutherford about the inner workings of Cellebrite — specifically the process of decoding — he claimed that he was unfamiliar with the process because he was not an expert in Cellebrite. (Doc. 536 at 322-323). Agent Rutherford was also unable to provide any explanation for the data points from 2022. Agent Rutherford's lack of expertise on Cellebrite prevented Blair from conducting meaningful cross examination on the extraction process and the ways that the process can malfunction. This ultimately denied Blair his Sixth Amendment right to confront witnesses against him.  As such, the admission of the cellular extraction evidence warrants that his convictions be vacated.

## IV.    The district court erred in quashing Blair's subpoenas for former AUSA Ryan Christian.

The district court's decision to quash the subpoenas erred in three ways. First, the district court applied an arbitrary and capricious standard in deciding the motion. Second, the statute only authorizes application of *Touhy* regulations when the subpoena involves a current government employee. Third, the district court erred when it concluded that the testimony would not be admissible under the Federal Rules of Evidence. The government made no claim of privilege.

44

### A.    The district court's decision is reviewable

The so-called seminal case regarding subpoenaing government officials is *United States ex rel Touhy v. Ragen*, 340 U.S. 462 (1951). *Touhy* held that a regulation issued by DOJ, restricting disclosure of information and refusing to obey a subpoena duces tecum, was lawful. (*Id.* at 470). The current version of that DOJ regulation is issued pursuant to the "housekeeping statute", 5 U.S.C. § 301.

> The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

> *Id*.

As an initial matter, the last sentence of § 301 was added after *Touhy* was decided.

> The Touhy holding was also weakened by a 1958 amendment to the housekeeping statute, which added the language, "This section does not authorize withholding information from the public or limiting the availability of records to the public."

*Louisiana Dep't of Transportation & Dev. v. United States Dep't of Transportation*, No. CV 15-2638, 2015 WL 7313876, at *3 (W.D. La. Nov. 20, 2015) (unpublished).

And in *United States v. Reynolds*, the Supreme Court made clear that blanket deference to the government's assertions of privilege and refusal to cooperate with subpoenas is not acceptable.

> Regardless of how it is articulated, some like formula of compromise must be applied here. Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers. Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case.

*United States v. Reynolds*, 345 U.S. 1, 9–10 (1953).

> [T]hough Reynolds itself was a civil case, the Supreme Court recognized the special nature of criminal cases. In explaining why the Government's ability to invoke evidentiary privileges is treated differently in the criminal context, the Court stated: "[S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." Id. at 12. Thus, based on the analysis in Reynolds, the normal substantive law of privilege and rules of evidence—not the arbitrary and capricious standard of the APA—applies to the Government's motion to quash here.

*United States v. Rodgers*, No. 4:20-CR-00358, 2022 WL 1074013, at *3 (E.D. Tex. Apr. 8, 2022).

So, the district court's decision is reviewable, and the district court erred in quashing the subpoena and using an arbitrary and capricious standard to do so.

46

**B.** **The plain language of the authorizing statute applies only to current government employees**

*Touhy* dealt with an old version of § 301. The text of the statute makes clear that it only applies to current employees of the government. The text refers to 'employees." That term is commonly understood to mean and is naturally read to mean current employees, that is someone who has

> an existing employment relationship with the agency in question—i.e., *current* employees. *Black's Law Dictionary*, for example, defines "employee" as "[s]omeone who *works*"— present tense—"in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary (10th ed. 2014) (emphasis added).

*Koopmann v. United States Dep't of Transportation*, 335 F. Supp. 3d 556, 560–61 (S.D.N.Y. 2018).

Similarly, Merriam-Webster defines an employee as "one employed by another usually for wages or salary . . . " Employee Definition & Meaning - Merriam-Webster (last visited May 2, 2024). And in the absence of a definition in the text, "we give the term . . . its plain and ordinary meaning." *United States v. Ferguson*, __F. 4th __, 2024 WL 1868605 (11th Cir. 2024). The best reading of employee means current employee.

> If a business posts a sign on a door stating "Employees Only," it would plainly be unreasonable for a former employee to construe that as an invitation and enter. Indeed, a former employee who did so could undoubtedly be charged with trespassing, and could not be heard to complain that the sign was ambiguous, let alone an invitation to enter.

47

*Koopmann*, 335 F. Supp. 3d at 560–61.

Because the plain text of the authorizing statute only applies to current employees, the DOJ regulation exceeds the scope of the statute. "Under *Chevron*, if the statutory text is unambiguous and answers the question presented, we apply the text according to its terms with no need for deference." *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 734 (11th Cir. 2024). Here the text is clear, and the regulation's expansion of the text to include former employees deserves no deference. The district court erred in concluding that *Touhy* applied, and in quashing the subpoena. Blair's conviction should be vacated and the case remanded for a new trial.

### C.    The evidence was admissible under FRE Rule 608(a)

The district court also erred in finding the proposed testimony was inadmissible. Even if former AUSA Christian was covered by the DOJ CFR, Blair complied with the regulation. "[T]he *Touhy* regulations are only procedural, and do not create a substantive entitlement to withhold information." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 62 (1st Cir. 2007).

And the testimony was admissible. A witness may testify to a person's character for truthfulness based on their personal opinion or the person's reputation for untruthfulness. *United States v. Dotson*, 799 F.2d 189, 191 (5th Cir. 1986) (citing FRE 608(a)). In *Dotson*, the agents did not testify about how long they had known Mr. Dotson or what they had done to form their opinion of his truthfulness. (*Id*. at 193).

48

In finding error in the government soliciting such evidence about a defendant, the Fifth Circuit noted that FRE 701(a) limits lay opinion testimony to those based on the witness's rational perception. (*Id*. at 192) (quoting FRE 701(a)). This is often referred to as the "first-hand knowledge" rule, even though that is not what the text requires. Mr. Chirstian had an opinion based on rational perception, and any weakness in the testimony could have been explored on cross-examination.

Regardless, the first-hand knowledge rule is satisfied here. In addition to reviewing all of the evidence in the case, including recorded calls, text messages, witness interviews and documentary evidence, former AUSA Christian also met with Arias face to face for a debriefing. He had the opportunity to form an opinion about Arias's truthfulness. The government was free to cross-examine him about that opinion, but Blair should have been permitted to call him to testify about his opinion. The district court erred in concluding otherwise. Blair was denied his Sixth Amendment right to compulsory process and his Fifth Amendment right to due process. Accordingly, his conviction should be vacated and the case remanded for a new trial.

## V.    The district court erred by instructing the jury on deliberate ignorance.

The pattern jury instructions define deliberate ignorance as "[d]eliberate avoidance of positive knowledge" such as possessing a package and believing it contains drugs but avoiding learning that it does to maintain deniability. Eleventh Circuit Pattern Jury Instruction S8.  This

49

Court cautions against instructing juries on deliberate ignorance "when the evidence only points to either actual knowledge or no knowledge on the part of the defendant." *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993). And this Court has stated that the instruction should rarely be given. *See e.g. United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1992) (instruction should only be given in "comparatively rare cases"). *See also United States v. Ojebode*, 957 F.2d 1218, 1229 (5th Cir. 1992) ("Therefore the instruction should rarely be given").

At the same time, this Court has held in several cases that an erroneous deliberate ignorance instruction was harmless error. *United States v. Steed*, 548 F.3d 961, 977-78 (11th Cir. 2008) (citing examples, including *United States v. Kennard*, 472 F.3d 851, 858 (11th Cir. 2206)). But the risk of giving an erroneous deliberate ignorance instruction is significant.

> A deliberate ignorance instruction allows the jury to convict without finding that the defendant was aware of the existence of illegal conduct. It therefore creates a risk that the jury might convict on a lesser negligence standard. The jury, for example, might find deliberate ignorance merely because it believed the defendant should have been aware of the illegal conduct.

*Ojebode*, 957 F.2d at 1229.

Even though this Court cautions district courts against instructing juries on deliberate ignorance when the evidence only points to knowledge or no knowledge, *United States v. Stone*, 9 F.3d 934, 937 (11th Cir 1993), the practical effect of the harmless error standard, without additional

safeguard, means that the instruction is given more often than it should be, and rarely reversed.

Here, the government's theory of the case was actual knowledge. They argued that Blair recruited travelers, arranged all details of their travel, including the size and type of bag to bring, reclaimed the cans with drugs concealed inside, and then demanded payment from Arias's associate. (Doc. 540 at 1095-1098; 1105-06). They argued that he got photos of people's luggage to be sure the process was going smoothly. (*Id*. at 1106). They argued he stayed in touch with the travelers and made sure they were in their hotel room to meet Arias. (*Id*.). They argued he retrieved the cans himself sometimes, and repeatedly traveled to/delivered them to Rhode Island. (*Id*. at 1107-1108).  He took a video of cans in Arias's apartment to make sure they were "on the same page." (*Id*. at 1107-08). And the government flatly said, "What we're actually talking about here is knowledge." (*Id*. at 1110). The government paid lip service to deliberate ignorance and discussed the jury instruction. (*Id*. at 1110), but their theory was knowledge.

This court should not conclude it was harmless error to give the deliberate ignorance instruction. This is a clear case of did he or did he not know. The deliberate ignorance instruction lowered the government's burden of proof and created the risk of conviction on a lesser negligence standard about which *Ojebode* warns. "It is error to give the instruction

51

when there is evidence of only actual knowledge . . ." *United States v. Maitre,* 898 F.3d 1151, 1157 (11th Cir. 2018).

Before a district court gives a deliberate ignorance instruction, the government should be required to point to some evidence of "deliberate avoidance of positive knowledge" as the jury instruction requires. Eleventh Circuit Pattern Jury Instruction S8. The government did not do so here. The instruction was erroneous and was not harmless. This Court should vacate Blair's conviction and remand for a new trial.

## VI.    The evidence was insufficient to show that Blair had to requisite knowledge to be found guilty.

The due process guaranteed by the Fifth Amendment requires "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (applying the constitutional right to due process via the Fourteenth Amendment in a habeas challenge to a state conviction). "When a man's liberty is at stake, [the court] must be vigilant with this burden." *United States v. Louis*, 861 F.3d 1330, 1331-32 (11th Cir. 2017).

In a criminal prosecution, after the government has presented its entire case in chief, the court must enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29. Evidence is sufficient to support a conviction only if a reasonable jury could find that the evidence in the record established guilt

52

beyond a reasonable doubt as to every element. *United States v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009). "A conviction must be reversed, however, if a reasonable jury must necessarily entertain a reasonable doubt as to the defendant's guilt." *United States v. Thomas*, 916 F.2d 647, 653 (11th Cir. 1990). If the government fails to present evidence on a necessary element, there is insufficient evidence to support a guilty verdict. *See id.* at 654.

Here the government was required to prove beyond a reasonable doubt that Blair knowingly and willfully conspired to 1) import cocaine into the United States, 2) possess with intent to distribute cocaine, and 2) launder money. The government was also required to prove that Blair knowingly and willfully committed each of those substantive offenses. "Knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident. Eleventh Cir. Pattern Jury Instruction, Basic Instruction 9.1A. The government failed to introduce credible evidence that Blair had the requisite knowledge that his actions assisted in a criminal scheme that involved a controlled substance or proceeds from such.

The only witness who claimed to have direct knowledge of Blair's understanding of the contents of the fruit and vegetable cans was Arias. However, Arias did not testify that Blair had actual knowledge that the substance in the cans was a controlled substance. Instead, Arias admitted on cross-examination that he told Blair that the substance was "untraceable cocaine" or a substance that was not chemically cocaine. (Doc. 539 at 839,

845-846). Arias' own recorded communications with Blair showed that Arias told Blair that he was not aware of what was in the cans. (*Id.*). Arias went so far as to suggest to Blair that the DEA lab reports (finding that the substance was cocaine) could be wrong. (*Id.* at 846). Arias also admitted that he recruited many others into the conspiracy without telling them that they would be transporting cocaine.

Arias' testimony was insufficient to prove beyond a reasonable doubt that Blair knew the substance inside of the cans was a controlled substance. Without sufficient evidence as to Blair's knowledge of the substance in the cans, Blair's conviction for conspiring to launder money should also fall. Without proof that Blair knew that the money involved proceeds from the importation of a controlled substance, the government did not meet its burden to show that he "knowingly" engaged in a conspiracy to launder money. As such, the Court should vacate Blair's convictions and remand for a new trial.

## CONCLUSION

Based upon the foregoing argument and citations of authority, the Court should reverse the defendant's convictions, or alternatively remand for a new trial or for resentencing.

CAITLYN WADE
NICOLE KAPLAN
Counsel for Anthony Blair

**CERTIFICATE OF COMPLIANCE AND SERVICE**

This is to certify that the foregoing brief is in compliance with Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in Book Antiqua 14 point, a proportionally-spaced typeface, using the Microsoft Word 2016 word processing software. Moreover, this brief also complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it includes no more than 12,976 words, according to the same software. Finally, on the date set forth below, counsel uploaded this brief to the Court's web site, which promptly served opposing counsel:

> CALVIN ARTIE LEIPOLD
> DWAYNE A. BROWN, JR.
> Assistant United States Attorney
> United States Attorney's Office
> United States Courthouse
> 75 Ted Turner Drive, SW
> Atlanta, Georgia 30303

May 13, 2024.

CAITLYN WADE
Federal Defender Program, Inc.
101 Marietta St., NW, Suite 1500
Atlanta, GA   30303
(404) 688-7530
Caitlyn_Wade@FD.org
Counsel for Anthony Blair

NICOLE KAPLAN
Federal Defender Program, Inc.
101 Marietta St., NW, Suite 1500
Atlanta, GA   30303
(404) 688-7530
Caitlyn_Wade@FD.org
Counsel for Anthony Blair